IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN MARTIN ANDREWS, SR., | ) | Case No. 5:20-cv-1512 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, John Martin Andrews, Sr., seeks judicial review of the final decision of the

Commissioner of Social Security, denying his application for supplemental security income

("SSI") under title XVI of the Social Security Act.  Andrews suffers from chronic low back pain,

chronic obstructive pulmonary disease ("COPD"), and depression.  He challenges the ALJ's

negative findings, contending that the ALJ misevaluated the severity of his depression at Step

Two of the sequential evaluation process, the combined effect of his physical and mental health

symptoms at Steps Three and Four, and the opinion evidence also at Step Four.  Andrews has not

established a basis of remand on his Step Two and Three challenges or on the ALJ's evaluation

of the opinion evidence.  But because the ALJ failed to apply proper legal standards by not

adequately considering Andrews's nonsevere mental health impairments at Step Four, I

recommend that the Commissioner's final decision denying Andrews's application for SSI be

vacated and that Andrews's case be remanded for further consideration.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## I.      Procedural History

On April 11, 2017, Andrews applied for SSI.  (Tr. 168-73).[2]  Andrews alleged that he

became disabled on April 11, 2017, due to "1. L4 L5 [l]umbar issues; 2. COPD; 3. [n]erve

damage; [and] 4. [d]egenerative disc disease.  (Tr. 168, 193).  The Social Security

Administration denied Andrews's application initially and upon reconsideration.  (Tr. 73-85, 87-

98).  Andrews requested an administrative hearing.  (Tr. 117).  ALJ Amanda Knapp heard

Andrews's case on April 24, 2019 and denied the claim in a May 8, 2019 decision.  (Tr. 15-24,

31-62).  On May 11, 2020, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-3).  On July 8, 2020, Andrews filed a

complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Andrews was born on June 27, 1974 and was 42 years old on the alleged onset date.  (Tr.

73, 168).  Andrews completed high school in 1992.  (Tr. 194).  He had no specialized training or

past relevant work.  (Tr. 22, 194).

On May 7, 2017, Andrews prepared a function report, in which he indicated that he lived

alone in an apartment.  (Tr. 201).  His COPD prevented him from running or walking any

distance before needing to use his inhaler and catch his breath.  *Id.*  He couldn't sit for more than

an hour before his legs got numb and he could not stand for more than half an hour.  *Id.*  He also

got depressed, had no quality of life, and could not perform household tasks.  *Id.*  His daily

routine consisted of slowly getting out of bed, brushing teeth, drinking coffee, taking medicine,

eating, making phone calls, attending doctors' appointments, physical therapy, watching

television, taking a little walk, and a shower.  (Tr. 202).

---

[2] The administrative transcript appears in ECF Doc. 12.

Andrews reported that because of his condition, he needed to use a shower chair and had difficulty putting on pants and tying shoes.  *Id.*  He relied on a daily pill box to remind him to take his pills, used a back brace, and used a cane.  (Tr. 203, 207).  Although he prepared his own meals, his diet was limited by his food preparation abilities.  (Tr. 203).  He could not do yardwork and needed help doing laundry, cleaning, taking out the trash, and changing linens.  *Id.*  He went outside daily to go to the mailbox, and when he did not, it was because of his depression or pain.  (Tr. 204).  When he traveled, he could walk, use public transportation, or ride in a car.  *Id.*  He could go out alone and shop, which he did once a week for one and a half hours.  *Id.*

Andrews stated that his hobbies included puzzles, cards, and television.  (Tr. 205).  His social activities consisted of talking, walking, playing cards, watching a movie, and doing puzzles, which he did as often as he could.  *Id.*  He regularly went to the library, grocery store, and church, and he did not need to be reminded to go places, though he did need a cane and someone to help him with is groceries.  *Id.*  Andrews had problems getting along with others because of his depression and irritability due to pain.  (Tr. 206).  Because of his condition, he could: (1) lift no more than 10 lbs.; (2) minimally bend; (3) stand for half an hour; (4) walk half a block at a time with 4 minute breaks before continuing; (5) sit for 1 hour; (6) climb stairs 1 at a time; and (7) complete tasks "50/50."  *Id.*  His ability to concentrate was affected, but the degree depended on how he felt.  *Id.*  He could pay attention an "average amount."  *Id.*  He checked both "Yes" and "No" when asked whether he could finish what he started.  *Id.*  Andrews stated that he got along with authority figures "good" and had never been fired for problems getting along with others.  (Tr. 207).

3

**B.      Relevant Medical Evidence**

**1.      Physical Impairments**

Records from the Ohio Department of Rehabilitation and Correction indicated that Andrews had an L4-L5 fusion in 1994 and had suffered from chronic low back pain ever since. (Tr. 250, 252-53, 255, 268).  On November 16, 2002, he fell and hit his lower back, reporting pain in his mid-back that went down to his toes.  (Tr. 261, 268).  Upon examination, Andrews could ambulate smoothly.  (Tr. 261).  Andrews was diagnosed with lower back strain and contusion.  (Tr. 250, 261).  By November 18, 2002, his low back pain "resolved," and he had a steady gait.  (Tr. 249).

On April 27, 2016 – the next available treatment record – Andrews visited the Cleveland Clinic and was seen by Paul Steurer Jr., MD.  (Tr. 338).  Andrews reported cervical and thoracic strain with persistent pain, stiffness, and soreness.  *Id.*  He needed to take pain medication to get to the pain clinic in connection with a worker's compensation claim.  *Id.*  Upon examination, Andrews had tenderness over the cervical spine, some muscle spasms, and "okay" sensation and strength.  *Id.*  Dr. Steurer diagnosed Andrews with cervical and thoracic strain and refilled his prescriptions.  *Id.*

On May 11, 2016, Andrews returned to Dr. Steurer with continued aching, soreness, and tenderness in his back.  (Tr. 340).  Dr. Steurer noted that Andrews was being kept on medication until he could be placed into pain management.  *Id.*  Upon examination, Dr. Steurer noted marked tenderness to soreness, Andrews could forward flex 40-50°, and bend and rotate 20°.  *Id.* He diagnosed Andrews with lumbosacral sprain and herniated L4-5 disc.  *Id.*

On June 1, 2016, Andrews went to Summa Health Barberton ("Summa") Emergency Department due to urinary retention.  (Tr. 307, 310).  In addition to urinary urgency and retention, Andrews reported that he took Percocet for chronic back pain and a history of COPD.

4

(Tr. 310).  Andrews further reported that he smoked .50 packs of cigarettes per day.  (Tr. 311).

A review of symptoms indicated that Andrews was negative for cough, shortness of breath, and

neck and back pain.  *Id.*  Upon physical examination, the attending physician – Paul Cornici, MD

– noted that Andrews had normal range of motion and no problems breathing.  (Tr. 310, 312).

Andrews was diagnosed with urinary retention and discharged in stable condition.  (Tr. 314,

323).

On June 15, 2016, Andrews returned to Dr. Steurer, reporting continued soreness,

tenderness, and stiffness associated with his neck and cervical thoracic strain.  (Tr. 355).

Specifically, a dull pain in his neck rated at 10/10.  (Tr. 358).  Andrews had been going to

physical therapy, which was helping "to a degree."  (Tr. 355).  A review of symptoms was

negative for chest and back pain.  *Id.*  Dr. Steurer stated that Andrews had some tenderness and

spasms over the neck, Andrews could "right and left 45° flexion extend 20°," and Andrews had

normal sensation and strength in his upper extremities.  *Id.*  Dr. Steurer diagnosed Andrews with

cervical strain, thoracic myofascial strain, and displacement of lumbar intervertebral disc without

myelopathy, prescribed Percocet, and referred Andrews for pain management.  (Tr. 355-57).

On August 10, 2016, Andrews reported to Dr. Steurer with postoperative herniated disc,

indicating that he still had associated chronic pain.  (Tr. 343-44).  A review of symptoms was

positive for lower back pain and negative for chest pain.  (Tr. 360).  Upon examination,

Dr. Steurer noted that Andrews could only forward flex 45° and bend and rotate 20° but had

"good strength and can raise onto his toes not weeks [*sic.*] heels."  (Tr. 344).  Dr. Steurer

diagnosed Andrews with sprain lumbar spine and postoperative herniated L4-L5 disc, continued

pain medication, and referred him for a pain management consultation.  *Id.*

Andrews returned to Dr. Steurer on November 9, 2016, reporting continued soreness and

tenderness in his back and occasional leg pain.  (Tr. 347).  He reported dull, aching, and sharp

back pain rated at 9/10.  (Tr. 372).  Upon examination, Andrews had tenderness across his back, muscle spasms, and could flex 45° and bend and rotate 20°.  (Tr. 347).  Dr. Steurer reiterated Andrews's diagnoses and continued pain medication.  *Id*.

On December 23, 2016, Andrews went to the Cleveland Clinic Emergency Department after he slipped and fell while going up stairs.  (Tr. 297).  Andrews stated that after the incident, his neck and back pain intensified, and he felt constant numbness and tingling in his legs.  *Id*.  He further stated that he was unable to ambulate or bear weight.  *Id*.  The nurse assessment indicated that Andrews arrived ambulatory, had steady gait, and reported his pain as 10/10.  (Tr. 301).  Upon review of symptoms, Andrews denied shortness of breath or wheezing.  (Tr. 297).

Upon physical examination, the attending physician – Rebecca Merrill, MD – noted normal respiratory exam.  (Tr. 298).  Andrews had mild tenderness at the base of the bony cervical spine and paraspinal muscles, could not sit up, and had pain with lifting his legs, but he had full range of motion in his back and legs.  (Tr. 298-99).  He had normal upper and lower extremity examinations, intact sensation in his feet, and normal strength in all limbs.  *Id*.  Andrews also underwent an X-ray of the cervical spine, which showed no acute findings.  (Tr. 299, 305).  Dr. Merrill diagnosed Andrews with muscle strain in the neck and back and discharged him with instructions to take naproxen as needed.  (Tr. 300).

On February 15, 2017, Andrews began receiving pain management treatment at Comprehensive Pain Management Specialists and was seen by Matthew Jones, MO.  (Tr. 412).  Andrews reported constant back, tailbone, and bilateral leg pain.  *Id*.  The pain was 10/10 at its worst and 8/10 at best, worsened by bending, twisting, pushing, pulling, lifting, and sitting longer than 30 minutes.  (Tr. 412-13).  He could walk about five to seven minutes.  (Tr. 412).  Epidural injections were "helpful," but he had not had once since 2003 or 2005.  (Tr. 413).  Andrews also reported smoking 6-10 cigarettes a day and had been smoking for over 25 years.  *Id*.

Upon review of symptoms, Andrews reported: (1) loss of balance; (2) trouble breathing; (3) muscle, neck, back, and joint pain; (4) joint stiffness and swelling; (5) muscle cramps; and (6) numbness and weakness in the bilateral lower extremities.  *Id.*  He denied trouble concentrating.  *Id.*  Upon physical examination, Dr. Jones noted: (1) that Andrews's breathing was non-labored; (2) tenderness in the thoracic and lumbar spine; (3) moderately limited flexion and extension in the lumbar spine; (4) sacroiliac joint tenderness; (5) positive straight leg raise test; (6) no clubbing, cyanosis, or edema; (7) normal radial pulse bilaterally; (8) normal reflexes; and (9) "hint of antalgia and upright" gait.  (Tr. 414).

Dr. Jones diagnosed Andrews with intervertebral disc displacement of the lumbar region, indicating that he had a displaced disc at L4-L5, chronic low back pain, and bilateral lower extremity radicular pains with left L5 and S1 hypesthesia and L5 weakness.  (Tr. 415).  Dr. Jones also noted that a 2012 MRI showed large L4-L5 protrusion and severe canal stenosis.  *Id.* Dr. Jones prescribed hydrocodone-acetaminophen, physical therapy, acupuncture, and epidural steroid injections, and ordered imaging tests.  (Tr. 416).

Andrews underwent an MRI on March 9, 2017, revealing post-surgical changes consistent with a prior left-sided laminotomy and microdiscectomy of L4-L5 and L5-S1.  (Tr. 331, 333).  The MRI also showed some endplate degenerative changes at L4-L5, mild spondylosis, residual small broad-based disc bulges with some enhancing granulation tissue ventrally and at the left lateral recess L4-L5, and 3mm recurrent herniation at the left paracentral region of L5-S1.  (Tr. 333).

On March 15, 2017, Andrews returned to Dr. Jones to review the MRI results.  (Tr. 408). Dr. Jones stated that the MRI showed "dramatic decrease in size of the L4-5 herniation, and a 3 mm L5-S1 reherniation."  (Tr. 410).  Andrews continued to report low back pain and bilateral radicular symptoms to the right leg and heel and to the left calf, as well as some leg weakness.

7

*Id*.  Andrews indicated that hydrocodone helped control his pain and helped him function, and the tizanidine was reducing the muscle spasms.  *Id.*  Dr. Jones continued medication and referred Andrews for chronic pain treatment.  (Tr. 411).  On March 22, 2017, Andrews received a lumbar epidural steroid injection.  (Tr. 406-07).

On March 30, 2017, Andrews visited Sean Asp, PT, for physical therapy treatment.  (Tr. 404).  Andrews reported 9/10 pain in the lumbosacral spine and bilateral lower extremities, with 10/10 pain at its worst and 6/10 at its best.  *Id.*  He reported increased pain when standing/bending more than 30 minutes, sitting for more than 5 minutes, and lifting.  *Id.*  Pain decreased with position change, heat, and pain medication.  *Id.*  Upon evaluation, Andrews had: (1) abnormal lumbar range of motion, with 25% flexion, 75% extension, and 50% side flexion with pain reported; (2) 5/5 bilateral lower extremity strength except 4/5 trunk, hip, and knee strength; (3) severe restriction in hamstring flexibility and moderate restriction in piriformis flexibility; (4) antalgic gait pattern with decreased cadence and  flexed posture; (5) pain with palpation of bilateral lumbar paraspinals and increased muscle tension; (6) positive slump test; and (7) negative straight leg raise test.  *Id.*  Asp determined that Andrews had decreased range of motion, flexibility, strength, and function and difficulty walking due to lumbar disc displacement, which would benefit from physical therapy.  (Tr. 404-05).

On April 4, 2017, Andrews returned to Physical Therapist Asp for a follow up, reporting 10/10 low back pain.  (Tr. 401).  Asp stated that Andrews could perform all exercises without increasing pain, and Andrews reported "my pain level went down to about an 8/10 it feels much better than when I came in."  *Id*.  On April 5, 2017, Andrews visited Comprehensive Pain Management Specialists and received a second steroid epidural injection.  (Tr. 399-400).  He returned to physical therapy on April 11, 2017, indicating the injections helped the left side of his back "a little," but the right side was "still pretty bad."  (Tr. 393).

On April 12, 2017, Andrews visited Dr. Jones, reporting that the epidural steroid injections decreased his left leg radicular pains significantly, such that they were essentially gone. (Tr. 392). Specifically, he experienced less than 50% relief for five days. (Tr. 389-90). Acupuncture decreased his pain for about an hour and physical therapy was helping. (Tr. 392). He continued to have chronic pain (8/10) but was able to function better with hydrocodone. (Tr. 390, 392). Upon examination, Dr. Jones noted: (1) Andrews's breathing was non-labored; (2) his thoracic spine was non-tender; (3) he had tenderness to the paravertebral muscles and midline tenderness; (4) he had moderately limited flexion and extension of the lumbar spine; (5) his straight leg raise was positive for sciatica on the right and pain mostly on the upper thigh/lateral buttocks on the left; and (6) he had normal reflex and upright station. (Tr. 390). Dr. Jones continued physical therapy, acupuncture, and medication. (Tr. 392).

Also on April 12, 2017, Andrews visited Dr. Steurer, reporting 8/10 back pain. (Tr. 350, 376, 378). Dr. Steurer noted muscle spasm and tenderness, Andrews could flex 60° and bend and rotate 20°, and Andrews had good strength in his legs. (Tr. 350, 376).

On April 13, 2017, Andrews received another session of physical therapy, stating that he had 6/10 low back pain. (Tr. 387). Andrews returned on April 18, 2017 for a follow up on his physical therapy, stating his pain was 8/10 and his tailbone was really sore. (Tr. 385). After the session, he reported "significant relief." *Id*. At an April 20, 2017, physical therapy session, Andrews reported 5-6/10 low back pain. (Tr. 383).

On May 10, 2017, Andrews visited Dr. Jones, reporting that the physical therapy had not relieved his pain, he was unable to go to his last acupuncture appointment, and Percocet was helping with the pain. (Tr. 437). He reported a "significant return" of his radicular low extremity pains and continued to have low back pain. (Tr. 437, 439-40). Andrews indicated that the second acupuncture treatment was effective and that the epidural steroid injections lasted for

about 1.5 weeks.  (Tr. 440).  Dr. Jones continued physical therapy, acupuncture, and medication and ordered a third epidural steroid injection.  *Id.*

On May 23, 2017, Andrews had a physical therapy session, reporting increased tailbone area pain (9/10) and difficulty breathing associated with warmer weather.  (Tr. 435).  The physical therapist noted increased muscle tightness, shortness of breath, and decreased pace.  *Id.* On June 7, 2017, Andrews received a third epidural steroid injection.  (Tr. 432-33).

On June 14, 2017, Andrews returned to Dr. Jones for a follow up on his injection, reporting 55% relief, 7/10 pain, and decreased cigarette use to 5 or less per day.  (Tr. 428, 430). Dr. Jones noted that Andrews's medication continued to help control his pain and Andrews was excited about starting vocational rehabilitation. (Tr. 430).  Dr. Jones continued Andrews's medication, physical therapy, and acupuncture.  (Tr. 430-31).

On July 6, 2017, Andrews returned to Asp for physical therapy, reporting increased low back pain (9/10), which he attributed to returning to work.  (Tr. 426).  Andrews requested a shorter, 15-minute session because he was too tired from work.  *Id.*  After the session, Andrews noted a slight decrease in pain.  *Id.*

On July 13, 2017, Andrews had a follow-up appointment with Dr. Jones.  (Tr. 422).  He reported his pain as 7/10 and stated that his medication continued to control his pain, but he did not get good relief after four hours.  (Tr. 422, 424).  He also failed vocational rehabilitation.  (Tr. 424).  Dr. Jones continued physical therapy and acupuncture, increased Andrews's Oxycodone dosage, and referred Andrews to neurosurgery.  (Tr. 424-25).

On February 14, 2018, Andrews visited the Cleveland Clinic for a new patient evaluation and was seen by Katherine Guran, MD.  (Tr. 459).  Andrews reported 8/10 low back pain, which he described as tender, stinging, cramping, and sharp.  *Id.*  He also had numbness and tingling without weakness radiating into the left lower extremity.  *Id.*  His pain worsened with standing,

sitting, walking, and activity and improved with lying down.  *Id.*  He had tried physical therapy,

heat, acupuncture, epidural injections, and surgery, which helped "some."  *Id.*  He was smoking

one pack a day.  (Tr. 461).

A review of symptoms was positive for fatigue, cough, shortness of breath, joint pain,

joint stiffness, and muscle weakness.  (Tr. 460).  Upon examination, Dr. Guran noted: (1) normal

gait; (2) bony tenderness along the lower lumbar vertebrae; (3) paraspinal muscle tenderness;

(4) reduced range of motion due to pain; (5) normal strength except left 4/5 dorsiflexion;

(6) intact sensation; (7) negative straight leg raise and femoral stretch test; (8) normal flexibility

in piriformis; and (9) no clubbing, cyanosis, or edema.  (Tr. 462).  Dr. Guran diagnosed Andrews

with sprain of low back, lumbar sprain, and bulging of intervertebral disc between L4 and L5.

(Tr. 462-63).  Dr. Guran prescribed water physical therapy, Cymbalta, and duloxetine.  *Id.*

On April 30, 2018, Andrews returned to Dr. Guran for a follow up, reporting continued

8/10 low back pain.  (Tr. 471).  He indicated that Cymbalta did not improve his pain.  *Id.*

Andrews's physical examination was similar to his previous one, except he had normal gait with

a cane, and he had a positive straight leg raise and femoral stretch test.  (Tr. 473).  Dr. Guran

diagnosed Andrews with lumbar sprain and bulging of intervertebral disc between L4 and L5 and

replaced Cymbalta with amitriptyline.  (Tr. 474).

On February 11, 2019 – the next available treatment record – Andrews went to Summa's

emergency department after he slipped and fell on the stairs, landing on his low right back.  (Tr.

496-97).  Upon falling, his pain was 8/10 but had since reduced to 6/10.  (Tr. 497).  Upon

examination, Andrews had: (1) normal neck range of motion; (2) minimal lumbar spinous

process tenderness to palpation; (3) bilateral lumbar paraspinous muscle tenderness with spasm;

(4) 5/5 strength in all extremities; (5) intact sensation; and (6) positive straight leg test at 30°

bilateral lower extremities.  (Tr. 499).  X-ray results showed no acute fracture.  (Tr. 500-02).

11

The attending physician – Tonya Neumann, MD – diagnosed Andrews with strain of lumbar region and bilateral sciatica, which she treated with Flexeril, Norco, and Deltasone.  (Tr. 502-03).

On May 1, 2019, Andrews visited Amy Westfall, CNP, as a new patient.  (Tr. 66).  Andrews reported his COPD diagnosis, which had been treated with Ventolin and albuterol.  *Id*.  He continued to smoke, but only five to six cigarettes per day, whereas before he had smoked up to three packs per day.  *Id.*  Nurse Westfall diagnosed Andrews with COPD and nicotine dependance and refilled his medication.  *Id.*

### 2. Mental Impairment

On April 6, 2017, Dr. Jones conducted a clinical depression screening of Andrews.  (Tr. 395).  Andrews reported little interest in doing things and depression.  *Id.*  He also reported inattention, an inability to complete tasks as compared to before his injury, and trouble sleeping.  (Tr. 396-97).  He had never attended counseling or received psychiatric medication.  (Tr. 396).  Upon examination, Andrews: (1) was alert and oriented; (2) was adequately groomed; (3) had good concentration and intact memory and judgment; (4) had normal affect, euthymic mood, and appropriate thought process; (5) denied suicidal ideation; and (6) had normal vegetative signs (insomnia, weight, libido, and activity).  (Tr. 395-96).  Dr. Jones determined that Andrews had moderately severe depression and diagnosed him with major depressive disorder moderate and recurrent.  (Tr. 395, 397).  Dr. Jones prescribed counseling on an as-needed basis.  (Tr. 397).

During his May 10, 2017 follow-up visit with Dr. Jones regarding his back pain, Andrews reported feeling depressed and trouble sleeping.  (Tr. 439).  Andrews denied feeling depressed during his later June 14, 2017 appointment.  (Tr. 430).  He again reported to Dr. Jones feeling depressed on July 13, 2017.  (Tr. 424).

12

On May 1, 2019 – the next treatment record – Nurse Practitioner Westfall conducted a depression screening of Andrews.  (Tr. 66).  Andrews reported little interest or pleasure in doing things.  *Id.*  Nearly every day, he: (1) felt tired or had little energy; (2) had poor appetite or overate; (3) had trouble concentrating on things, such as reading or watching television; and (4) moved or spoke so slowly that others could notice or, conversely, was so fidgety or restless that he moved around more than usual.  (*Id.*).  More than half the days, he felt feeling down, depressed, or hopeless.  *Id.*  Nurse Westfall determined that he had moderate depression and prescribed Wellbutrin.  (Tr. 66-67).

C.     **Relevant Opinion Evidence**

1.     **Physical Impairment**

a.     **Consultative Examiner – Yolanda Duncan, MD**

On August 21, 2017, Andrews underwent studies of his cardiovascular, pulmonary, and peripheral vascular systems in connection with a state claim for disability, which was performed by Yolanda Duncan, MD.  (Tr. 443-55).  Dr. Duncan first performed a pre-exercise test exam, in which Andrews reported sharp stabbing pain on the left side of his chest that radiated into his neck and shoulder.  (Tr. 443).  Dr. Duncan noted dyspnea on exertion, orthopnea, and paroxysmal nocturnal dyspnea.  *Id*.  She opined that Andrews's functional class was New York Hearth Association ("NYHA") Class 2.  *Id*.  Dr. Duncan also stated that Andrews was negative for cardiac enlargement, chronic heart failure, peripheral pulses, pedal edema, stasis dermatitis, brawny edema, and ulceration and had "nl" peripheral pulses.  (Tr. 444).  Andrews underwent a pulmonary function study.  (Tr. 445).  Dr. Duncan's interpretation of the results was "severe restriction not improved after bronchodilators."  (Tr. 448-49).

### b.  State Agency Consultants

On August 29, 2017, Robert Klinger, MD, evaluated Andrews's physical capacity based on a review of the medical record and determined that Andrews had the physical residual functional capacity ("RFC") to perform light work.  (Tr. 81-82, 84).  Specifically, Dr. Klinger found that Andrews could: (1) lift/carry 20 lbs. occasionally and 10 lbs. frequently; (2) stand/walk for 6 hours in an 8-hour workday; (3) push and pull with no limits other than those for lifting/carrying; (4) climb ramps/stairs, stoop, and crawl occasionally; (5) balance, kneel, and crouch frequently; and (6) never climb ladders, ropes, or scaffolds.  (Tr. 81-82).  Dr. Klinger further found that Andrews had no manipulative, visual, or communicative limitations, but had to avoid concentrated exposure to fumes, odors, dusts, gasses, and poor ventilation.  (Tr. 82-83).  He also found that Andrews had to avoid all exposure to hazards.  (Tr. 83).  On December 24, 2017, Diane Manos, MD, concurred with Dr. Klinger's assessment of Andrews's RFC.  (Tr. 93-95, 97).

### 2.  Mental Impairment

### a.  Consultative Examiner – Robert Dallara, Jr., PhD

On December 19, 2017, Andrews visited Robert Dallara, Jr., PhD, for a psychological evaluation to determine whether his psychological condition was more probable than not related to a workplace injury he suffered in 1994.  (Tr. 456-58).  At the time of evaluation, Andrews: (1)  was appropriately dressed and groomed; (2) had appropriate affect; (3) tended to be "somewhat fidgety and showed an impaired gait;" (4) knew his age, birthday, and social security number; (5) was able to count backwards from 20 down to 1 and say the alphabet correctly; (6) was unable to count from 1 to 40 by 3s, but did "fair at serial subtraction;" (7) could recall 5 digits forward and 3 reversed; (8) could recall 2 items out of 3 after a 5 minute period; (9) was

able to describe the similarities between objects; (10) knew the number of months in a year and the function of a thermometer; and (11) was able to identify Martin Luther King.  (Tr. 457).

Andrews described his mood as depressed, which he started feeling following his back surgery.  *Id.*  Crying spells were rare, but he had some loss of interest and energy.  *Id.*  Andrews attributed his depression to his inability to "do things" and that "things were good before" his injury.  *Id.*  He had trouble maintaining sleep, previously experienced transient suicidal thoughts, was often worried about his health and finances, could not handle stress, and sometimes experienced shortness of breath and light headedness.  *Id.*  He also had trouble with his memory, forgetting conversations, where he placed things, and what he was going to do – which caused him to have a "hard time finishing things."  *Id.*  And he self-reported anxiety.  *Id.*  Andrews reported that he received outpatient mental health treatment sometime between 2005 and 2007, but otherwise denied receiving treatment by a mental health professional.  (Tr. 456).  During the day, he spent his time watching television and making phone calls.  (Tr. 457).  He cooked using the microwave and he did "very little" cleaning, laundry, or shopping.  *Id.*  He enjoyed drawing but otherwise denied other activities.  *Id.*

Dr. Dallara stated that the information provided suggested Andrews could maintain himself in the community without unusual supports.  (Tr. 457-58).  Psychological testing indicated depression in the "severe" range, and Dr. Dallara diagnosed Andrews with unspecified depressive disorder.  (Tr. 458).  Dr. Dallara found that there was insufficient evidence to advance an anxiety disorder diagnosis.  *Id.*  Dr. Dallara opined that it was more probable than not that Andrews's depression was related to his workplace injury and that, due to its severity, Andrews "would not be able to successfully engage in sustained remunerative employment in a competitive environment."  *Id.*

### b.      State Agency Consultants

On May 15, 2017, Kathleen Malloy, PhD, evaluated Andrews's mental capacity based on a review of the medical record.  (Tr. 79-80).  Dr. Malloy considered Andrews's depression, but determined that it was nonsevere.  (Tr. 79-80).  Dr. Malloy found that Andrews had no limitations in his ability to understand, remember, or apply information or in interacting with others.  (Tr. 80).  She found mild limitations in his ability to concentrate, persist, or maintain pace and in adapting and managing himself.  *Id*.  On December 20, 2017, Paul Tangeman, PhD, concurred with Dr. Malloy's assessment.  (Tr. 91-92).

### 3.      Other Source Opinion – Ohio Bureau of Workers' Compensation

On June 30, 2017, the Ohio Bureau of Workers' Compensation ("BWC") issued a report on Andrews's vocational rehabilitation.  (Tr. 482-93).  According to the report, Andrews was referred for vocational rehabilitation on May 3, 2017 and was initially evaluated on May 19, 2017.  (Tr. 483).  The case manager opined that Andrews's feasibility for vocational rehabilitation was poor, such that it was unlikely that Andrews could obtain employment as a result of vocational rehabilitation services.  *Id*.  The case manager's opinion was because Andrews: (1) had restrictions in the light to medium "PDL;" (2) reported pain ranging from 6.5 to 10 and displayed observable pain behaviors; (3) had not worked in 13 years; (4) lacked computer skills for effective job searching; (5) had an employment history focused in areas classified in the medium and heavy demand level; (6) could not return to his employer of record; (7 ) was prescribed and taking narcotics for pain; (8) had a prior felony conviction; (9) had no driver's license/lacked reliable transportation; and (10) had a history of noncompliance/attendance issues.  *Id.*

The case manager indicated, however, that Andrews had a significant interest in participating in vocational rehabilitation and was motivated to return to work.  *Id.*  The case

manager conducted a situational work assessment to evaluate Andrews's ability to get to work, overcome transportation barriers, perform job duties according to directions, sustain a workday, and perform specific job tasks.  *Id.*  For that evaluation, Andrews was placed at a Goodwill six miles from his home from June 6 to June 25, 2017.  *Id.*

On day **one**, Andrews worked from 10:15 a.m. to 2:45 p.m. and, after intake and a tour of the facilities, was allowed to work until he could not tolerate the pain.  (Tr. 485).  He was noted to follow directions "perfectly."  *Id.*  On day **two**, Andrews worked from 9:15 a.m. to 12:15 p.m. (Tr. 486).  He reported being in a lot of pain after receiving an epidural steroid injection and having sat for an extended period of time at his son's graduation the day before.  *Id.*  Andrews left early because his pain level was too uncomfortable.  *Id.*  On day **three**, Andrews called off work because he was in too much pain.  *Id.*

On day **four**, Andrews worked from 9:15 a.m. to 3:15 p.m. to make up for some of the missed time from the week before, indicating he felt "good" about his pain after taking a 15-minute break and going between sitting and standing.  (Tr. 487).  On day **five**, he worked from 9:15 a.m. to 2:15 p.m. without incident.  (Tr. 488).  On day **six**, Andrews worked around five and a half hours.  *Id.*  On day **seven**, Andrews called off work because the weather caused him a lot of pain and he needed to recover from the weekend.  (Tr. 489).  On day **eight**, Andrews worked from 9:15 a.m. to 3:00 p.m. to make up for some his missed hours.  *Id.*  On day **nine**, worked from 10:00 a.m. to 12:30 p.m., arriving late for his shift and ceasing work because he was in a lot of pain.  *Id.*  On day **ten**, worked from 9:15 a.m. to 2:45 p.m., during which he took one 15-20 minute break.  (Tr. 490).

The case manager discussed Andrews's work performance with him.  (Tr. 483). Andrews stated that it was "quite a change" for him to get up in the morning and get into a routine, which likely caused his pain and missed workdays.  (Tr. 484).  Performance wise,

Andrews's superior noted that he performed well and met quality standards. (*Id.*). Due to Andrews's inability to overcome his pain and maintain good attendance, the case manager opined that it was highly unlikely that he could be able to return to work via vocational rehabilitation services. (*Id.*).

### D. Relevant Testimonial Evidence

Andrews testified at the April 24, 2019 ALJ hearing. (Tr. 37-57). He lived with three relatives. (Tr. 38). If his destination was within walking distance, he would walk to get exercise. (Tr. 38-39). Otherwise he got a ride. (Tr. 39). He took a bus to get to the hearing. *Id.* The last time he worked was at Goodwill in 2017. *Id.* Before then, he worked for Sterilite Plastics in 2005 or 2007 for three months doing light assembly. (Tr. 40). He left the job because he was on his feet too much and it was too far a distance for him to travel. (Tr. 41). He didn't work between then and 2017 because he fell into a depressive state. *Id.* He had applied to jobs, but no one wanted to hire him, likely because he disclosed his injury on the applications. *Id.*

Andrews testified that the main reason he couldn't work was because almost everything he knew how to do was labor, and he couldn't bend, lift, or carry things like he used to because of his back. (Tr. 42). His tailbone hurt all the time, his feet were numb, he had pain in his left leg, and he had intermittent pain in his right leg. (Tr. 43). He took over-the-counter medication, but it did not provide relief. *Id.* Acupuncture was effective for about 15 minutes and epidural steroid injections provided only little relief. (Tr. 44). Prescription medication was helpful, but he stopped taking them when he had to care for his mother in Alabama, resulting in a lapse in medical treatment. (Tr. 44-45). Andrews helped his mother by preparing microwave food and washing things in small loads. (Tr. 46).

Andrews testified that he had to use his inhaler after walking a block and a half. (Tr. 47). His COPD slowed him down. *Id.* He treated his COPD with a nebulizer at least three times a

day and reduced his smoking.  *Id.*  He could wash himself, but he would have someone tie his shoes for him.  (Tr. 49).  He also could dust his television, clean clothes in small loads (four pounds), and take out the trash in his own room.  *Id.*  He could not take out the trash for the house because he couldn't move the canisters.  *Id.*  Standing at the sink to clean dishes caused bad pressure in his back, causing pain.  (Tr. 50).  He could shop, push a cart, and pick out his food, but he didn't reach or bend for things.  *Id.*  He usually had someone carry the groceries for him.  *Id.*

For his mental health, Andrews testified that he managed it "okay."  (Tr. 55).  Andrews testified that, socially, he talked on the phone a lot.  (Tr. 51).  He had two good friends he associated with that would stop by after they got out from work.  *Id.*  But he didn't go out often.  *Id.*  Andrews passed the time drawing and trying to get into tattoos.  (Tr. 52).  It was hard because he couldn't sit for too long.  *Id.*  A tattoo would take at most seven hours with breaks, which would take him a couple of days.  *Id.*  He also read and watched television.  *Id.*

On a typical day, it would take Andrews half an hour to get out of bed.  (Tr. 53).  He would smoke a cigarette, brush his teeth, and make coffee.  *Id.*  He would watch the weather on the television, drink coffee, have another cigarette, and call his mother.  *Id.*  He would then get dressed and hang around the house.  *Id.*  Around noon, he would make lunch, lie down, read a book, and take a nap.  *Id.*  He would then call his family, constantly shifting between sitting and lying down.  (Tr. 53-54).  He tried to do some physical therapy exercises, but it was hard getting up from the floor.  (Tr. 54-55).

On examination by counsel, Andrews testified that he had to get rid of his dog because he couldn't bend over to give her food and she got too big.  (Tr. 56).  He was unable to sit through a whole movie due to discomfort.  *Id.*  He slept in intervals, shifting between positions as his discomfort woke him up.  (Tr. 57).

The vocational expert testified that once a person was off-task 15% or more of the workday on a regular and continuous basis, there was no work they could perform.  (Tr. 61). Once a person was absent more than once on a regular basis, there would be no work.  (*Id.*).

## III.  The ALJ's Decision

On May 8, 2019, the ALJ issued a written decision denying Andrews's claim.  (Tr. 15-24).  The ALJ made the following paraphrased findings relevant to Andrews's arguments in this case:

> 2.  Andrews had the severe impairments of: degenerative disc disease of the lumbar spine, status post-laminectomy; and COPD.  (Tr. 17).
>
> 3.  Andrews had no impairment or combination of impairments that met or medically equaled the severity of the listed impairments.  (Tr. 18).
>
> 4.  Andrews had the RFC to perform light work except: (1) he could stand/walk up to 4 hours in an 8-hour workday; (2) he must be permitted to alternate between sitting and standing or walking at intervals of 30 minutes or longer while remaining on task and at his workstation; (3) he could frequently balance, kneel, or crouch; (4) he could occasionally climb ramps or stairs, stoop, or crawl; (5) he could never climb ladders, ropes, or scaffolds; (6) he had to avoid concentrated exposure to poor ventilation and pulmonary irritants; and (7) he had to avoid exposure to workplace hazards.  (Tr. 19-20).
>
> Relatively benign diagnostic test results, clinical observations, and Andrews's daily activities did not support the severity of Andrews's alleged musculoskeletal complaints.  (Tr. 20).
>
> Significantly, although a vocational rehabilitation specialist cited some barriers to Andrews returning to work, Andrews's work performance was overall satisfactory.  Andrews reportedly did his best work when he was on a job where he was able to walk around and alternated between sitting and standing, even working extra time to make up for missing work without any mention of pain. And some of Andrews's work interference was the result of activities he engaged in outside of work.  (Tr. 21).
>
> Andrews's medical records indicated a past medical history of COPD, but there was nothing "reflective of this condition as a current diagnosis."  Although his pulmonary function test showed severe restriction, Andrews had not been treated

for exacerbations of his condition, he had not undergone any treatment other than inhalers, and he continued to smoke half a pack of cigarettes a day.[3]  (Tr. 21-22).

The state agency consultants' opinions regarding Andrews's physical RFC and the nonsevere nature of his mental health impairments were found to be persuasive.  (Tr. 22).

The opinion of "John M. Andrews, Ph.D." that Andrews would not be able to engage in sustained remunerative employment because of his depression was found to be unpersuasive.[4]  (*Id.*).

Opinions concerning Andrews's qualification for BWC benefits were found unpersuasive, though the ALJ considered the evidence underlying the opinions.  (*Id.*).

9.   Considering Andrews's age, education, work experience, RFC, and the vocational expert testimony, there were jobs that existed in significant numbers in the national economy that he could perform, such as cashier, photocopy machine operator, and marker.  (Tr. 23).

Based on all of her findings, the ALJ determined that Andrews was not disabled.  (Tr. 23-24).

## IV.   Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

---

[3] In discussing Andrews's COPD treatment, the ALJ said "It is notable from the medical record … that [Andrews] has been treated for exacerbations of the condition or undergone any treatment other than inhalers."  (Tr. 21).  Given the second dependent clause of the sentence, it appears the ALJ mistakenly omitted "not" from the first independent clause.

[4] Although the ALJ referred to "John M. Andrews," it is clear from context that the ALJ was evaluating Dr. Dallara's opinion.  *See* (Tr. 22 (citing Tr. 456-58)).

21

the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quotation mark omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and

logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

**B.      Step Two: Depression as a Nonsevere Impairment[5]**

Andrews argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence when she determined that his depressive disorder was not a "severe" impairment.  ECF Doc. 14 at 11-12; ECF Doc. 17 at 1.  In light of Dr. Dallara's report, Dr. Jones's depression diagnosis, Andrews's statements to Dr. Guran, and his testimony, Andrews argues that the ALJ's finding that his depression was not a severe impairment was erroneous.  ECF Doc. 14 at 12-13; ECF Doc. 17 at 1.

The Commissioner responds that substantial evidence supported the ALJ's finding that depression was a nonsevere.  ECF Doc. 16 at 9-12.

**1.      Law**

At Step Two, a claimant must show that he has *at least one* "severe impairment."  20 C.F.R. § 416.920(a)(4)(ii), (c).  An impairment qualifies as "severe" if it (1) has more than a minimal effect on an individual's ability to perform physical or mental work; and (2) is either expected to result in death or last – or has lasted – a continuous period of at least 12 months.  20 C.F.R. §§ 416.909, 416.920(a)(4)(ii); *Salmi v. Sec'y of Health and Hum. Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).  Mental health impairments are evaluated by rating the degree of the claimant's functional limitation in four functional areas outlined in the paragraph B criteria of Listing 12.00E: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate,

---

[5] For ease of analysis, the disparate arguments scattered across the first argument subsection in Andrews's merits brief are reorganized in this R&R to fit within the five-step analytical framework for Social Security cases.  Any arguments that might be lost in the distillate are forfeited for insufficient articulation. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (agreeing with the Seventh Circuit that judges are not truffle-hunting pigs).

persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(3).  The

paragraph B criteria are rated on a five-point scale from "none" to "extreme."  20 C.F.R.

§ 404.1520a(c)(4).  A rating of "none" or "mild" will ordinarily result in a finding that the

impairment is not severe unless the evidence indicates more than a minimal limitation in the

ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).

> ### 2.     Analysis

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in her Step Two evaluation of Andrews's depression.  The ALJ applied proper legal

standards by considering Andrews's medically determinable impairment of depressive disorder,

evaluating the impairment under the paragraph B criteria, analyzing each of the four functional

areas separately, and concluding – in light of that analysis – that his depressive disorder did not

cause more than minimal limitation in his ability to perform basic mental work activities.  20

C.F.R. § 404.1520a(c)(3), (d)(1); 20 C.F.R. § 416.920a(a)(4)(ii); (Tr. 17-18).

Substantial evidence also supports the ALJ's paragraph B findings.  Substantial evidence

supports the ALJ's determination that Andrews's ability to perform new tasks with multi-step

instructions while undergoing vocational rehabilitation showed that he had no limitation in

understanding, remembering, or applying information.  (Tr. 17).  This included: (1) Andrews's

vocational rehabilitation report, which indicated that he did well performing tasks and met

quality standards; (2) individualized progress reports of Andrews's work at Goodwill, stating

that he followed directions "perfectly" and performed a variety of multi-step jobs; and (3) the

state agency consultants' opinion that Andrews had no limitations in this area.  (Tr. 79-80, 92,

484-90).

Substantial evidence supports the ALJ's finding – based Andrews's vocational

rehabilitation, testimony, treatment notes, and function support – that he had no limitations

interacting with others. (Tr. 18). Specifically: (1) Andrews's statement in his function report that he got along with authority figures and had never been fired for problems getting along with others; (2) Andrews's testimony that he socialized a lot over the phone, frequently interacted with friends after work, and visited his son and grandson every weekend; (3) treatment notes through February 11, 2019, noting that Andrews was cooperative and displayed normal mood and behavior; and (4) the state agency consultants' opinion that he had no limitations in this area. (Tr. 51, 53-54, 80, 92, 207, 312, 390, 395, 408, 414, 422, 428, 437, 462, 473, 499).

Substantial evidence supports the ALJ's finding that Andrews had mild limitations in concentrating, persisting, or maintaining pace, given: (1) Andrews's statement in his function report that his ability to concentrate was affected to a degree depending on how he felt; (2) Dr. Jones's clinical depression screening, in which he found that Andrews had good concentration and intact memory; (3) the vocational rehabilitation report, noting that Andrews met quality standards and performed well; (4) individualized reports from Goodwill noting no issues; and (5) the state agency consultants' opinion that he had only mild limitations in this area. (Tr. 80, 92, 207, 395, 484-90). Although there was evidence that Andrews was unable to maintain regular attendance at Goodwill, he only attributed it to his pain, not his depression. (Tr. 485-90).

And substantial evidence supports the ALJ's finding – based on his activities of daily living and treatment notes – that Andrews had mild limitation in adapting and managing himself. Specifically: (1) treatment notes through April 30, 2018 noting that Andrews was well appearing and pleasant; (2) Andrews's statements in his function report that he needed a shower chair and had difficulty tying his shoes and putting on pants; (3) Andrews's testimony that he was able to bathe, dress, and do laundry, (4) Dr. Dallara's statements that Andrews appeared to have adequate hygiene and grooming and did not display bizarre behaviors; (5) Dr. Jones's clinical

depression screening, indicating that Andrews was adequately groomed, had normal appearance, and had intact judgment; and (6) the state agency consultants' opinion that Andrews had only mild limitation in this area.  (Tr. 49, 53, 80, 92, 202-03, 390, 395, 408, 414, 422, 428, 437, 457, 462, 473).

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the record, the ALJ's evaluation of Andrew's depression at Step Two fell within the Commissioner's "zone of choice" and cannot be overturned by this court.  *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *O'Brien*, 819 F. App'x at 416.

### C.    Step Three: Listings 1.04 (Musculoskeletal Disorders) and 3.02 (Chronic Pulmonary Insufficiency)

Andrews next argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in her evaluation of whether his musculoskeletal and respiratory impairments met or medically equaled Listings 1.04 and 3.02.  ECF Doc. 14 at 13-15. However, Andrews does not argue that the evidence established that his impairments met or medically equaled these Listings, or any other Listing.  Instead, he argues that the ALJ improperly discounted the March 9, 2017 MRI, which, if credited, would not have resulted in an RFC of light work.  ECF Doc. 14 at 13-14.  He also argues that the ALJ failed to consider the "totality of his documented back problems … and his severe [respiratory] restriction … and totally ignored his psychological problems."  ECF Doc. 14 at 15.[6]

The Commissioner responds that substantial evidence supported the ALJ's finding that Listings 1.04 and 3.02 were not met or medically equaled.  ECF Doc. 16 at 12-19.

---

[6] Although Andrews frames his arguments as a challenge to the ALJ's Step Three findings, they appear targeted at the ALJ's findings at Step Four and Five that he could perform light work and work on a sustained basis.  *See* ECF Doc. 14 at 13-15; ECF Doc. 17 at 2.  I will consider Andrews's arguments in reviewing the ALJ's RFC findings in Section IV.D. below.

Andrews's Step Three challenge does not establish a basis for remand.  Andrews does not dispute that the ALJ considered Listings 1.04 and 3.02.  He does not dispute the ALJ's findings that the evidence did not establish that his impairments met or medically equaled these Listings. And he does not argue that his impairments, singularly or in combination, met or medically equaled a Listing not considered by the ALJ.  Rather, Andrews contends that, even assuming the Listings weren't met, the ALJ failed to consider the totality of his documented back problems, the severe restriction of his respiratory impairment, and the combined effect of his musculoskeletal and his respiratory impairments.  ECF Doc. 14 at 15.  But the ALJ did consider the evidence Andrews faults the ALJ for ignoring – the March 9, 2017 MRI, his treatment records, and the pulmonary function test.  (Tr. 18-19, 20-21); *see Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").  Andrews has not articulated how this evidence would have established that his impairments met or medically equaled a Listed impairment.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *see also Moats v. Comm'r of Soc. Sec.*, No. 3:20-cv-00265, 2021 U.S. Dist. LEXIS 104504, at *53-54 (N.D. Ohio Jan. 8, 2021).  And his argument that the ALJ should have weighed his March 9, 2017 MRI results more heavily than his February 11, 2019 X-ray study is not a proper basis upon which to seek remand.  *See Jones*, 336 F.3d at 476.

Accordingly, this portion of Andrews's argument has not satisfied his burden to show that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

**D.     Step Four: Subjective Symptom Complaints**

Andrews argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in her evaluation of Andrews's subjective symptom complaints.  ECF Doc. 14 at 16-20.  He argues that the ALJ's recitation of his subjective

symptom complaints erroneously disregarded his testimony and statements in his function report detailing how his back pain and respiratory problems impaired his ability to lift, carry, bend, climb stairs, walk, shop, care for pets, sit for prolonged periods of time, dress, and shower.  ECF Doc. 14 at 18-19.  He argues that his back pain complaints were consistent with his statements to treatment providers, and the ALJ's failure to consider his continuing back pain and its limiting effects was not supported by substantial evidence.  ECF Doc. 14 at 19-20.  He also argues that the ALJ's finding that he could remain on task and at his workstation failed to consider the effect of his pain on his concentration.  ECF Doc. 14 at 20.  In a separate section, he argues that the ALJ erred in discounting the March 9, 2017 MRI, which resulted in the erroneous finding that he could perform light work.  ECF Doc. 14 at 13-14.

The Commissioner responds that the ALJ's evaluation of Andrews's subjective symptom complaints regarding his back pain and COPD was supported by substantial evidence.  ECF Doc. 16 at 16-19.  The Commissioner does not mention or address the ALJ's consideration of Andrew's depression symptoms in her evaluation of his subjective symptom complaints.  *See generally* ECF Doc. 16.

### 1.    Step Four Standard

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14.  Relevant evidence includes a claimant's medical

history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13-14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, at *15; 20 C.F.R. § 416.929(c)(3).

If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  Although the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which she relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79.

## 2.  Physical Impairments

The ALJ applied proper legal standards in evaluating Andrews's subjective symptom complaints regarding his physical impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by: (1) assessing Andrews's RFC in light of the medical

evidence, his testimony, and other evidence in the record; and (2) clearly explaining that she rejected Andrews's subjective symptom complaints because his statements regarding the intensity, persistence, and limiting effects of his medically determinable impairments were not consistent with the objective medical evidence.  20 C.F.R. § 416.920(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13-15; (Tr. 20-22).  The ALJ provided sufficiently clear reasons for rejecting Andrews's subjective symptom complaints when she stated that: (1) Andrews's diagnostic test results and clinical observations were inconsistent with the severity of his alleged musculoskeletal symptoms; (2) his activities of daily living indicated a greater level of functioning than alleged; (3) his vocational rehabilitation report indicated overall satisfactory performance; and (4) Andrews had never been treated for exacerbations or received treatment other than inhalers for his COPD.  (Tr. 20-21).

Substantial evidence also supports the ALJ's conclusions regarding Andrews's subjective symptom complaints on his physical impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Substantial evidence supports the ALJ's determination that the objective medical evidence, his activities of daily living, and the vocational rehabilitation report were inconsistent with the severity of his alleged musculoskeletal symptoms.   (Tr. 20-21).  Such evidence includes: (1) the March 9, 2017 MRI, which Dr. Jones interpreted as showing a dramatic decrease in the size of Andrews's hernia; (2) the February 11, 2019 X-ray study showing no negative findings; (3) physical exam results through February 11, 2019 showing normal neck range of motion, 5/5 strength in all extremities, intact sensation, normal gait with a cane, and moderately limited flexion; (4) treatment notes observing Andrews to be in no acute distress despite repeated reports of 8/10 and 10/10 pain; (5) Andrews's testimony that he walked to exercise and travel to places within walking distance, could clean and do small loads of laundry, and could shop on his own; (6) the vocational rehabilitation report that Andrews performed well and met quality standards,

although he missed some work due to pain; and (7) the state agency consultants' opinion that
Andrews could perform light work.  (Tr. 49-52, 81-84, 93-97, 312, 331-33, 355, 360, 390, 408-
10, 413-14, 422-23, 428-29, 437-38, 462, 473, 483-84, 499).

And substantial evidence supports the ALJ's finding that Andrews had never been treated
for exacerbations of his COPD or been treated with anything other than inhalers, and still
smoked half a pack of cigarettes per day.  A review of the record reveals no mention that
Andrews suffered any exacerbations of his COPD and his treatment records document only
inhalers to treat his COPD.  (Tr. 66-67, 308-09, 311, 357, 362, 365, 367, 370-71, 374, 377, 389,
408, 412, 422, 428, 437, 461, 472, 475, 497-98, 503, 507).  And despite being advised to quit
smoking, Andrews continued to smoke cigarettes, which the ALJ could properly consider in her
evaluation of Andrews's subjective symptom complaints.  (Tr. 66-67, 390, 409, 417, 423, 429,
431, 438, 461-62, 473, 498); *Marshall v. Comm'r of Soc. Sec.*, No. 13-CV-14255, 2015 U.S.
Dist. LEXIS 21547, at *19 (E.D. Mich. Feb. 24, 2015).

Because the ALJ applied proper legal standards and his conclusions were reasonably
drawn from the record, the ALJ's evaluation of Andrews's subjective symptom complaints
regarding his physical impairments fell within the Commissioner's "zone of choice" and cannot
be disturbed by this court.  *Mullen*, 800 F.2d at 545

### 3.    Mental Impairments

While presented in a confusing fashion, Andrews has established that the ALJ failed to
apply proper legal standards in evaluating Andrews's depression.  Specifically, the ALJ failed to
mention at Step Four her consideration, if any, of Andrews's nonsevere impairment of
depression in determining the RFC.  *See* SSR 96-8p, 1996 SSR LEXIS 5, at *14-15.  Before I
explain why, it's worth noting that Andrews barely raised this issue.  The argument section of his
merits brief is organized into three subsections, the second of which concerns the ALJ's

evaluation of his subjective symptom complaints.  *See* ECF Doc. 14 at 10-25.  His arguments in

that subsection do not raise the issue of whether the ALJ failed to consider his depression in her

evaluation of his subjective symptom complaints.  *See* ECF Doc. 14 at 16-20.  Andrews only

mentions the fact that he was depressed in passing in his summary of his function report, which

he argues the ALJ erroneously disregarded.  ECF Doc. 14 at 19 ("He was also depressed.").  And

he does not contend that the ALJ should have assessed any functional limitations in the RFC

based on the evidence of his depression symptoms.  *See* ECF Doc. 14 at 20.  Rather, he focuses

almost all of his argument to the ALJ's evaluation of his back pain.  ECF Doc. 14 at 19-20.

In his subsection one arguments, however, Andrews asserts as part of his Listings

challenge that the ALJ failed to consider that the totality of his impairments, including his

"psychological problems," which rendered him "unable to engage in substantial gainful activity

on a sustained basis."  ECF Doc. 14 at 15-16.  While made in the context of the ALJ's evaluation

of the Listings at Step Three in his merits brief, Andrews's reply brief suggests that the argument

instead referred to the ALJ's evaluation of his subjective symptom complaints at Step Four.  ECF

Doc. 17 at 2.  Specifically, he makes the argument in his discussion of *Lorman v. Comm'r of

Soc. Sec.*, and the Southern District Court of Ohio's holding that the ability to perform some

activities on a limited basis is not substantial evidence that a claimant's symptoms were not

disabling; a holding made in reference to the ALJ's Step Four findings.  ECF Doc. 17 at 2 (citing

*Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015)).  Inartful

presentation aside, I find the issue sufficiently raised in Andrews's merits brief to warrant our

evaluation of whether the ALJ properly considered at Step Four Andrews's nonsevere

impairments.

The ALJ's discussion of Andrews's subjective symptom complaints only mentioned his

musculoskeletal symptoms and COPD.  (Tr. 19-21).  There was no mention of Andrews's

depression diagnosis or mental health treatment.  *See id.*  Instead, the ALJ indicated at Step Two that the RFC "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  (Tr. 18).  The problem with that statement is that "the limitations identified in the 'paragraph B' … criteria are *not* an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 SSR LEXIS 5, at *13 (emphasis added).  The ALJ was required to go further and conduct a "detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C."  *Id.*  By incorporating by reference her paragraph B findings as part of her RFC assessment, the ALJ erroneously conflated the distinct steps of the sequential evaluation process.  *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 811 (S.D. Ohio 2015); *see Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (holding that the ALJ erred in basing his mental RFC assessment at Step Four solely upon his severity evaluation at Step Two).

The ALJ's omission is compounded by the fact that she found mild limitations in two of the four areas analyzed at Step Two yet did not explain why this did not result in any limitation in the RFC.  (Tr. 17-18).  The ALJ had no obligation to include mental limitations in the RFC, but she was required to state the basis for concluding that the mild limitations resulting from Andrews's depression did not result in any work-related restrictions, both singly and in combination with his other impairments.  SSR 96-8p, 1996 SSR LEXIS 5, at *5; *e.g.*, *James v. Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 U.S. Dist. LEXIS 28813, at *32-33 (N.D. Ohio Feb. 20, 2020); *Patterson*, No. 5:14 cv 1470, 2015 U.S. Dist. LEXIS 125841, at *9-10; *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 U.S. Dist. LEXIS 23918, at *17 (E.D. Mich. Feb. 27, 2015).

Although the ALJ found persuasive the state agency consultants' opinion regarding Andrews's mental health impairment, their opinion was only that his depression was nonsevere because the paragraph B criteria were not satisfied.  (Tr. 22, 79-80, 91-92).  In essence, the ALJ merely repeated her Step Two finding and credited the state agency consultants' opinion so finding.  *James v. Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 U.S. Dist. LEXIS 28813, at *32 (N.D. Ohio Feb. 20, 2020).  And the ALJ's evaluation of Dr. Dallara's psychological evaluation does not clarify her RFC assessment because she discounted Dr. Dallara's evaluation for not articulating specific functional limitations, for his lack of a treating relationship, and for his reliance on Andrews's subjective symptoms.  (Tr. 22).  The ALJ's evaluation of the opinion evidence does not explain why no functional limitations related to Andrews's depression were not included in the RFC despite finding that he had mild limitations.

The error is not harmless.  The ALJ's decision failed to build an accurate and logical bridge between the evidence of Andrews's depression, the ALJ's findings of mild limitations, and an RFC with no limitations related to his depression.  *Fleischer*, 774 F. Supp. 2d at 877.  It may well be that the ALJ's Step Two findings also would have supported a determination that Andrews's mild limitations in his ability to concentrate, persist, maintain pace, and adapt or manage himself did not restrict work activity.  "However, it is for the ALJ to make this determination and provide an explanation in the first instance, not this Court."  *James*, No. 1:19 CV 570, 2020 U.S. Dist. LEXIS 28813, at *33; *see also Jones*, 336 F.3d at 476; *Murray v. Colvin*, No. 3:12-0410, 2014 U.S. Dist. LEXIS 149172, at *32 (M.D. Tenn. Oct. 16, 2014).

Because the ALJ failed to apply proper legal standards in her evaluation of Andrews's subjective symptom complaints, I recommend that the ALJ's decision be vacated and remanded so that the ALJ can explain the decision not to include any mental limitations in the RFC.  *See e.g.*, *James v. Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 U.S. Dist. LEXIS 28813, at *33;

34

*May v. Comm'r of Soc. Sec.*, 2:19-cv-4479, 2020 U.S. Dist. LEXIS 75113, at *10-13 (S.D. Ohio

April 29, 2020); *Patterson*, No. 5:14 cv 1470, 2015 U.S. Dist. LEXIS 125841, at *10.

### E.     Step Four: Weighing of Opinion Evidence

Andrews argues that the ALJ failed to apply proper legal standards or reach a decision

supported by substantial evidence in her evaluation of the opinion evidence.  ECF Doc. 14 at 20-

23.  He argues that the ALJ failed to apply proper legal standards when she found that the

vocational rehabilitation report "was evidence regarding [his] BWC benefits," when it wasn't.

ECF Doc. 14 at 22.  The failure to consider the vocational rehabilitation report, he argues, was

not harmless because it documented two absences and one late arrival to work and the VE

testified that being absent more than once per month was work preclusive.[7]  ECF Doc. 14 at 23.

He argues that the ALJ failed to consider Dr. Dallara's psychological evaluation.  ECF Doc. 14

at 22.  Even if the ALJ had considered Dr. Dallara's evaluation, Andrews argues that the ALJ

erred by not noting that Dr. Dallara was a frequent state agency consultative examiner.  *Id.*

Andrews also argues that the ALJ's evaluation of the state agency consultative examiners'

opinion of his physical RFC was not supported by substantial evidence because the consultative

examiners' opinions were themselves not supported by substantial evidence.  ECF Doc. 14 at 21.

He challenges the consultative examiners' opinions because they did not note that he was

considered NYHA Class 2 and did not have the opportunity to review the vocational

rehabilitation report or Dr. Dallara's evaluation.  *Id.*

The Commissioner responds that the ALJ properly found the opinions related to

Andrews's BWC benefits (Dr. Dallara's evaluation and the vocational rehabilitation report)

---

[7] Andrews couches his harmless error argument between recitations of law concerning the ALJ's
responsibility at Step Five of the sequential evaluation, which the Commissioner has interpreted as raising
a Step Five challenge.  ECF Doc. 14 at 23-24; ECF Doc. 16 at 23-24.  My reading of Andrews's brief,
however, is that he is not raising a separate and distinct Step Five challenge.

unpersuasive and properly evaluated Dr. Dallara's evaluation. ECF Doc. 16 at 20-23. The Commissioner argues that the ALJ correctly found that Dr. Dallara's evaluation was unsupported when she found that his assessment was inconsistent with his own objective findings. ECF Doc. 16 at 22. And the Commissioner argues that the ALJ correctly found that Dr. Dallara's evaluation was inconsistent with the objective findings in the record and was based largely on Andrews's self-reported subjective symptoms. ECF Doc. 16 at 22-23.

In reply, Andrews argues that the ALJ failed to provide a coherent explanation for why she found Dr. Dallara's "opinion" unpersuasive. ECF Doc. 17 at 2-3.

### 1. Medical Opinion Evaluation Standard

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating opinion evidence for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 416.920c(a). Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(2). If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 416.920c(b)(3) (internal citations omitted) (emphasis added). Other factors include: (1) the length, frequency,

purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 416.920c(c)(3)-(5). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 416.920c(c)(1)-(2).

### 2.    Vocational Rehabilitation Report

The ALJ applied proper legal standards in her evaluation of the vocational rehabilitation report. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The vocational rehabilitation report was made by the Ohio BWC for the purpose of determining whether Andrews could obtain employment through its vocational rehabilitation program. (Tr. 482-84). Decisions by state agencies on whether a claimant is "employable" are not binding on the Commissioner. 20 C.F.R. § 416.904. The reason why is, as with state agency decisions on entitlement to *benefits*, they are based on the state agency's own rules and standards. *Id.* Because the vocational rehabilitation report was made for the purposes of determining Andrews's eligibility for vocational rehabilitation services through BWC, the ALJ correctly found that it expressed an opinion on his eligibility for benefits and was unpersuasive on that basis. 20 C.F.R. § 416.904; *see* 20 C.F.R. § 416.920b(c)(2) (stating that disability examiner findings made about a vocational issue are "inherently neither valuable nor persuasive" for which the Commissioner "will not provide *any* analysis" of how it was considered (emphasis added)).

The ALJ was, however, required to consider the evidence underlying the vocational rehabilitation report, such as the individual reports of Andrews's performance at Goodwill, to the extent it was consistent with the severity of his pain symptoms. 20 C.F.R. § 416.904; 20 C.F.R.

§ 416.929(c)(3).  And the ALJ did just that, noting that the pain's interference with his duties "resulted when [Andrews] engaged in additional activities the day or night before, such as attending a graduation or cookout."  (Tr. 21).

### 3. State Consultants

Andrews's has not established a basis for remand on the ground that the ALJ relied on the opinion of state agency physicians who did not have the full record before them.  In the Sixth Circuit, the ALJ may rely on the opinion of a consulting physician who did not have the opportunity to review later-submitted medical records so long as there is "some indication" that the ALJ at least considered the fact that the opinions were outdated before assigning them greater weight.  *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th Cir. 2016) (quotation marks omitted).  The ALJ discussed Andrews's medical records through February 2019 and the opinion evidence through December 2017 and indicated that she based her RFC finding on the entire record.  (Tr. 19-22); *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  Thus, there is at least some indication that the ALJ considered Andrews's post-opinion evidence before finding persuasive the state agency consultants' physical RFC findings.  *See Spicer*, 651 F. App'x at 493-94; *see also Van Pelt v. Comm'r of Soc. Sec.*, Case No. 1:19-cv-2844, 2020 U.S. Dist. LEXIS 244781, at *33 (N.D. Ohio Dec. 30, 2020); *Jacks v. Comm'r of Soc. Sec.*, No. 3:15-cv-309, 2017 U.S. Dist. LEXIS 19229, at *13-14 (S.D. Ohio Feb. 10, 2017).

Andrews's argument that the ALJ could not rely on the state agency consultants' opinion because they failed to mention Dr. Duncan's opinion that Andrews was NYHA Class II is likewise unavailing.  The evidence was before them when they issued their opinion, and they expressly cited the Duncan pulmonary function study in explaining their findings.  (Tr. 74, 80, 84, 88, 95-96).  And Andrews has not pointed to any authority requiring state agency physicians to detail the substance of every report they considered in completing their assessment of the

claimant's functional limitations.  *See* ECF Doc. 14 at 21; *see also Brandes v. Colvin*, No. 4:15-cv-01737, 2017 U.S. Dist. LEXIS 6012, at *23 (E.D. Mo. Jan. 17, 2017).

### 4.     Dr. Dallara

Andrews is correct to point out that the ALJ mislabeled Dr. Dallara's psychological evaluation as being authored by "John M. Andrews, Ph.D."  (Tr. 22).  But that did not constitute a failure to consider the evaluation.  The ALJ considered the evaluation and treated it as a medical opinion.  (Tr. 22).  A remand for the ALJ merely to correct a typographical error when it was plain in her discussion of the evidence – that when she said "John M. Andrews" she meant to say "Robert F. Dallara, Jr." – would be futile.  *See Gavit v. Comm'r of Soc. Sec.*, No. 17-13066, 2018 U.S. Dist. LEXIS 219348 at *9 (E.D. Mich. Dec. 7, 2018) ("While the ALJ may have improperly identified Mr. Wood as 'Dr. Wood' in her analysis, there is no evidence that such a misidentification was anything by a harmless scrivener's error.").

Andrews's other challenge to the ALJ's evaluation of Dr. Dallara's psychological evaluation also does not establish a basis for remand.  Although the ALJ treated the evaluation as opinion evidence, the ALJ also noted that Dr. Dallara's evaluation did not set forth specific functional limitations.  (Tr. 22).  The ALJ's observation was accurate.  Dr. Dallara's evaluation articulates Andrews's subjective complaints, the result of psychological testing, Dr. Dallara's diagnosis, and Dr. Dallara's opinion on the connection between Andrews's depression and his work-related injury and Andrews's ability to work.  (Tr. 456-58).  A medical opinion is a "statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [he] had one or more impairment-related limitations or restrictions." 20 C.F.R. § 416.913(2).  Dr. Dallara's statement regarding Andrews's ability to work was not a medical opinion because it concerned an issue reserved to the Commissioner.  20 C.F.R. § 416.920b(c)(3).  And aside from concluding that Andrews had severe depression, Dr. Dallara

made no findings on how that diagnosis affected Andrews's ability to perform work-related tasks or what Andrews could still do despite his impairment.  20 C.F.R. § 416.913(2).  Because Dr. Dallara's evaluation didn't set forth functional limitations, it was not an opinion that was subject to 20 C.F.R. § 416.920(c)'s framework for evaluating the persuasiveness of opinion evidence.  Thus, Andrews has not established that a remand is warranted based on any alleged error the ALJ may have committed in evaluating Dr. Dallara's psychological evaluation.  *See Rabbers*, 582 F.3d at 654.

**V.      Recommendation**

Because the ALJ failed to apply proper legal standards in her evaluation of Andrews's mental health subjective symptom complaints, I recommend that the Commissioner's final decision denying Andrews's application for SSI be vacated and that Andrews's case be remanded for further consideration.

Dated: July 14, 2021

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).